We'll call the first case 2-1-50904, United States v. Cortez, Mr. Sherwood, and then Mr. Sherwood. Good morning. May it please the court and counsel, Gregory Sherwood appearing court-appointed to counsel for the appellant, Martin Vlas Cortez. I have a very short statement summarizing the facts and the arguments, and then I'll be glad to answer your questions. This case results from a Sunday, July 18, 2020 incident between 9 a.m. and 10-15 a.m. at an Odessa Denny's parking lot. There was a check welfare call made to the police. My client was asleep in his truck. It's a Saturday night, Sunday morning, so the officers think this is a possible DWI case. Four officers respond. The client wakes up, and he, as you'll see on the video, he barely cracks his windshields, which the window tint is too dark under Texas law, but no ticket or citation is given for the dark window tint. Mr. Cortez hands an identification card, not a driver's license, and he says, I don't have a valid driver's license. The officers testify at the suppression hearing that even though they could have arrested him for driving with an invalid license, they were not going to do that. I submit that that's not only subjective belief, but objective belief. The officer says he's not going to arrest someone and doesn't arrest someone. That doesn't later spring into existence to justify the later search. The check welfare transformed into a license sticker that was from another county, that was from another vehicle. The client, Mr. Cortez, explained my vehicle was stolen in Ward County, I made a report about it. It was actually his mother's vehicle. And Ward County is an adjacent county, and that investigation turned out to be proper, so the officers decided, well, we're not going to arrest him for having an invalid, what I call sticker, license sticker. There were no active warrants on Mr. Cortez. Finally, Corporal Box conducted an HGN test for intoxication on Mr. Cortez, and he testified that he exhibited zero out of six clues. And I've worked on criminal appeals for almost 20 years, I've never seen that testimony. Usually somebody's . . . What period of time are you saying was unlawfully prolonged? I'm saying at 9.47 a.m. when . . . Because it is quite an extraordinary cascade of legitimate investigation, disagree if you will. In other words, they've got a trespass, then they see tinted windows, then the guy says he doesn't have a license, then sort of bizarrely the car appears to have been stolen, then he admits he's got drug convictions, all of that. And then they have to confirm he's not intoxicated. So the police are legitimately pursuing a lot of suspicion. Yes. And then, but you would say all of that stopped? At what point? At 9.47 a.m. when Corporal Box testified, I wasn't . . . my DWI investigation ended, I wasn't going to arrest him for DWI, I didn't smell breath, I didn't smell alcohol on his breath or in the vehicle, that should have been the end of it right there. But then the officers decide, well, we're going to call a K-9 unit because this guy has prior drug convictions. Now Judge Count's suppression order says that Mr. Cortez said that he failed some drug tests recently. Well, to be fair, it's not just he has priors, is it? He has committed two Texas offenses, the tinted glass and driving without a license. Yes, that's correct. But I submit that if that's how this court's going to rule, and I don't mean to be flippant or rude, I'm not sure why we're here for argument because that is an easy way to . . . Well, we're here for argument because what's your law that says those three indicia don't equal reasonable suspicion? Prior drug convictions, illegality as to driving without a license, illegality as to window, and, right, those three plus they say protective of the truck, whether we agree with that or not. What's your case that would say that amalgam isn't reasonable suspicion? Well, I would submit that the recent opinion in McKinney from June 10th, 2022, which . . . You cited, right? I'm sorry? You cited? I cited in my . . . I cited the 2020 opinion in my appellant's brief because Judge Count cited it in his suppression order. I used Judge Count's suppression order as a guide. In 2020, this court remanded McKinney to the San Antonio Federal Court to say, conduct a hearing on the suppression motion. In that case, there was no evidential hearing. The judge just denied it, pounced on the back, said, have a hearing. They had a hearing. It looks like the judge just kind of did the same thing to which the pound chastises the judge. I guess I'm saying here, we've got a hearing, we've actually got people testifying. I mean, that hearing in McKinney seemed, at best, somewhat perfunctory. I'll just put it that way. I was just saying contrasting here where you've got depositions, you've got this whole line of testimony, et cetera. It seemed that the pound version, a lot was that . . . it just didn't feel . . . a lot had happened. I mean, it's unusual. They remand and say, have a hearing. Basically, it just was kind of sent back. That's all I'm saying. How much can you get out of McKinney given the stark difference in just the procedure itself, much less the outcome? I understand, Judge Stewart, but the June 2022 opinion in McKinney, which I believe Judge Higginson was on the panel, but it's a procurium opinion so I don't know who wrote it, pointed out that basically the hearing was not very . . . well, let me rephrase. It basically said this was a hunch. This man was in the wrong place at the wrong time. That's all I was trying to point out. I was trying to see maybe what you would want to say, and that was to say the pound kind of concerned that even though they sent it back, really not much happened. That's all. I was trying to say it because you maybe not want to say it. I'm just trying to contrast here where there is a full-blown hearing and it's just Higginson was just trying to hone in here to have some basis. In other words, McKinney, they said it was just a hunch, and they somewhat judged Higginson's answer. You're not arguing that all the officers had here was a hunch, right? Well, I'm saying the officers learned that Mr. Cortez had prior drug convictions. Mr. Cortez says on the video that I used to be hooked on crack cocaine, but that was months ago. I took methamphetamine for pain. When I first heard the video, I thought he said prescription drugs, but I believe it was the citation of the government. He does say I took methamphetamine for pain, but that was months ago. The government's brief says that these are failed drug tests during the period of supervised release, but it just occurred to me in the last few days, if that was really the case, the revocation petition should have listed that as a ground for revocation, but the revocation petition, which is joined with this appeal of the 2020 offense, only listed the 2020 offenses as a ground for revocation. Now, I've worked on a lot of state appeals, especially during the pandemic, because that's all the appeals we were getting. There were no jury trials. I've worked on a lot of state appeals involving revocation petitions. Those probation officers put in every single violation they can, because all you need on appeal is to uphold one violation, and that's the end of the case. I believe that if there had been failed drug tests during Mr. Cortez's supervised release, that would have been in the revocation petition, but all Mr. Cortez says is I did it in the past, I did it months ago, and yet the suppression order says recent, and the government . . . The issue before us is the conditional plea, right? The issue is the suppression. Yes. I'm just going to ask you again, other than McKinney, what would you point to as a Fifth Circuit case where we've reversed saying this level of suspicion doesn't reach reasonable suspicion? Do you have one? No, I do not. Frankly, many of the cases would affirm based on that finding, but in this case, there were so many things happening and the police just kept saying, well, we're not going to do this, we're not going to do this, we're not going to do this. Oh, we're going to do the K-9 search and the K-9 alerts, but the K-9 alerts for drugs, and all they find are two bullets. Well, and I don't know if you had them below you. Someone made a calculated decision to stipulate to trial. I agree there's a lot of oddity here. It's just a bullet. It's his mother's car. The police went in because they said he didn't consent. That's bizarre. So there's a lot, but there was a stipulated trial, and the decision was the suppression issue. So I guess let me rephrase the question. I have two questions. One is, if the starting point of is there any residual reasonable suspicion is 947, how would any unlawful detention have affected the dog sniff if your client couldn't drive away anyway, right? He's got no license. He would have had to call somebody to come get him and have a tow truck or drive. Yes, he would have had to have someone come get him. But my point is, if the argument is that there was an illegal prolonged detention that gets you the last 15 minutes, he actually couldn't have gotten back in that car and driven away. That dog was going to get there. He can't drive because he doesn't have a license. Well, but the dog should have been called at 9 o'clock when Officer Box or, I'm sorry, Corporal Box, Corporal Jones, Corporal Tarango. I'm just asking you, your theory is that the prolonged detention under Rodriguez was improper. And I'm asking how even if it were, even if he had been released at 947, wouldn't the dog have come anyway? He can't drive that car. The dog wasn't called until 10 o'clock. But yes, you're correct, Judge Higginson. He cannot, Cortez cannot drive the vehicle away because he doesn't have a valid driver's license. But the K-9 unit wasn't called until 10 or sometime between 947 and 10. And the K-9 alerts at 1012. Maybe someone else would have gotten the car. Is that the point? I'm sorry, maybe. Maybe somebody else would have gotten the car? Yes, maybe. He could have called a relative, a friend to say, I can't drive the truck home. Come pick me up and take the truck home. Something like that. Legally, the government's making a bolder proposition against you. You didn't file a reply brief, so we don't yet have your answer. The government's saying, well, whenever a motorist is stopped with an arrestable offense, that probable cause justifies waiting, I guess, interminably. In other words, we'll ask them what their limiting theory is, but you haven't yet had a chance to respond to that. That would take this case out of the world of assembling reasonable suspicion. It would mean every time a traffic stop is grounds for probable cause, they don't need to worry about the prolonged detention law. Do you have thoughts on that theory? Yes, that's a very good point. And if that is the law, then we might as well not even be talking about prolonged detentions or anything like that, because anybody who is driving with an invalid license, anybody who has a defective brake light or tail light, anybody who— Okay, no, I just articulated those concerns. What's your legal answer? My legal answer would be that's just— I thought I was giving my legal answer, but— Well, you were saying the parade of horribles it could lead to, but how do you respond to the argument legally? If the officer decides he's not— Well, actually, I do have a response. I have a brief due in three weeks in another Odessa case. I'm not going to discuss it, but one of the officers in this case decides to arrest the person for having no license, and then the inventory searched the vehicle and finds some contraband. But when the officer says, I'm not going to arrest the defendant for this offense, that should be the end of it, that subjective and objective statement that he's not going to arrest for an invalid license, and that shouldn't allow things to continue down the line so that the police can later do a later search. That's the best legal argument I can come up with. But you're right. The government has made a bold argument. If that becomes the law, then anybody with an expired license plate, anybody with a broken taillight, anybody driving with no license, their subject—their SOL is the vernacular, let's say. All right, let me ask you maybe the same thing, but a little different. The officers come out to the muesli at 9 o'clock, or that's when the dispatch occurs. I think it's 9.40 or so, when the box says the intoxication is complete, that's kind of it, right? And so it's like 10-something, 10.12, after the dog gets there and all that. So from the time they say the intoxication decision is complete, through this period where he's in the car handcuffed, and they go through that, are you arguing that that's the period of time that's unreasonable under the Fourth Amendment, that's violative, or are you saying the whole time period, or whatever it is, almost an hour, I mean, what gets you there? It's the same question, I guess, Judge Higginson is asking, but I mean, what gets you there? I mean, it is a long time, it's an hour, but because we think it was a long time, he's saying, well, they didn't really have anything to get him on, they just figured they'd keep doing it until they find something. And I mean, I get that intuitive approach to it, but the point is the one there, that doesn't get us within our cases to a point of saying, King's X, you know what I'm saying? So I'm saying, are you arguing that after they say it, the intoxication investigation is in, and they just decide to call the dogs, the sniffing, and somehow that's where it goes awry, and if so, what's the legal theory for that time period? Maybe that's not what you're arguing. Well, no, I think that's a fair summation, and let me see if I can repeat it or explain it better. I'm saying that when the officers decided all the investigations were over and that he wasn't intoxicated, that should have been the end of it. There shouldn't have been, why are we having a canine sniff? And I understand the government's arguments on that. But if the officers say, we're not arresting for this, that, and the other, it should not be prolonged any further. Now, the cases don't say that, but the problem is, under the government's theory, as I said earlier, anytime anybody's got any problem with their vehicle or with their license or with driving, they're going to have some problems. And most of these cases, the case law, they find something serious. Here we found two bullets. And I understand the statute criminalizes possession of ammunition. It could have been one bullet. But, I mean, well, I'm not going to say what I was just about to say. My time has expired. I don't know. You've been helpful with your responses, which we appreciate. But you have your rebuttal time, so we'll hear from the government and you have a chance to respond. Thank you. Thank you. All right. Mr. Fowler. Good morning, Your Honors. May it please the Court. Charles Fowler for the United States. I want to start out with a couple of facts that I heard during my opponent's presentation that I want to address because I think they're very important, particularly on the question of whether the sort of totality of circumstances justified extending the stop beyond 947. And first I want to home in a little bit on the issue of the registration sticker, which, as I understand it, is undisputedly a reasonable basis to conduct at least some investigation. And the record, unfortunately, is not terribly clear, and I think I could have done perhaps slightly a better job in my brief in pulling out exactly what happened when. But I don't think it's correct that the officers had concluded their investigation of the registration sticker by around 940 or so, which is the proposition in the defense brief, which the district court really didn't address because it found that by 945 there was reasonable suspicion anyway. Officer Tarango, after it's discovered that this sticker comes back to a stolen vehicle, goes to his car and makes a call to the Ward County Sheriff's Department. And on that call, he basically informs them, hey, we've got this sticker. It comes back to not the truck that we're standing here detaining but a different truck, and the operator basically, and this is all on Officer Tarango's body camera video that was offered his defense exhibit to, he learns the truck associated with this sticker has been recovered. There isn't a suspect. That's about 938. If anything, I don't think they've resolved the issue. They've learned there is a theft out there that there's not a suspect associated with, and the vehicle that was stolen in that theft, the sticker we now have here in Mr. Cortez's possession. So I don't think it's fair to say it's in any way resolved at that point. Then Officer Tarango goes and reports that information to the other officers who are around then learning from Mr. Cortez, hey, I've got my truck was also stolen. I've got these new plates, and the officers go in and find the paperwork for the new plates, and it does match Mr. Cortez's mother. The plates do match each other, but he explains that the registration office had apparently told him to leave this sticker on that had been taped to the inside of his windshield while his vehicle was stolen. And that's all that really had happened at 940 when the defense posits that that investigation is over. But at that point, they really haven't resolved anything. They have no idea why at that point, aside from Mr. Cortez's explanation, which they could credit or not, that that sticker was placed in there by thieves months earlier and is still there. I don't think it's quite fair to say that that's been resolved. And in fact, if you go through to the sort of the very end of the stop, still staying with Officer Tarango's body camera, just a couple of minutes before the dog alert, we're talking about 10-08, 10-09 at this point, you can hear Officer Tarango explaining to Mr. Cortez, you are still detained because of the sticker. We do have a canine coming, but you're still detained because of the sticker, because you've got a sticker in your vehicle that comes back to a stolen vehicle. And according to you, it's been in there for months. And according to you, the registration office told you— So from between when he clears the sobriety test to when the dog comes, just describe, bullet point, what the indicia of reasonable suspicion were. Is it one, the guy himself, Cortez, admits he's in a car that had been stolen, whosoever it is, it's pretty bizarre. Two, he admits he's been convicted for drugs and guns. And three, he's got tinted windows and he doesn't have a driver's license. That's the assembly. Those are certainly a few of them. I think there are several other important ones. I think just as a baseline against which all this is happening, it's an odd circumstance. The individual is sleeping in his truck at a Denny's. Yeah, but they've cleared the trespass concerns. They've cleared the others. I think they've cleared the concerns, Your Honor. But as things are addressed by the officers, just because the officers have sort of addressed these individual things and moved on to something else, I don't think they fall completely out of the totality of the circumstances. At some point, you know, you've got one, two, three things, and maybe I addressed them all. Maybe he's got an explanation for each one individually. But at some point, they start piling on, and what are the chances it's a coincidence that all of these circumstances that I might be able to satisfy myself of individually have coincided in a way that don't suggest criminal activity is afoot. So I think you've still got his refusal to get out of the truck for 15 minutes. That's suspicious. I think you've got— In my mind, you're positioned harder. Why does he have to get out of a truck? Well, the Supreme Court has said that— and I think this is Pennsylvania v. Mims— that you do have to— the officers do have a right for safety reasons to order someone out of a vehicle, to conduct a Terry detention outside of a vehicle, and that's for safety reasons. And that's exactly what they spent 14 minutes trying to explain to Mr. Cortez. The first 14 minutes of the stop were, Sir, we can't see into your vehicle. Sir, you've only given us a one-inch crack to see in. That's not the same as refusing to consent, right? Any motorist has the right to refuse to consent to enter. Yes, Your Honor. He displayed activities that were sort of threatening to the officers? Well, I don't think it was an overt threat so much as that he was simply refusing their lawful order to step out. That was a safety concern. Refusing their lawful order to roll his window down enough that they could see in, that's, again, a safety concern. He didn't have to consent to a search. He had a right not to do that, and the government does not argue that refusal to consent standing alone contributed to suspicion. The government does, however, argue that refusal of a lawful order to get out of the truck, and persisting in that refusal for 14 minutes, and refusing to roll the window down, perpetuating the officer's legitimate safety concerns, does contribute to suspicion. The government also argues that his repeated, in this court's decision in Reyes a couple of years ago, it described what was protective behavior towards an individual's vehicle. I think the record here shows Mr. Cortez continually volunteered without anyone saying anything about a search. You can't, you can't search this vehicle. My lawyer told me that you guys can't search this vehicle. Right about that. He is, well, he's right about it, and I think, you know. We have a body cam, right? The police, once he's out, they put themselves right in between that door. It's not going to shut again. They can see everything inside. He's not trying to say shut the door again, is he? No, Your Honor. What's unusually protective about that? He's between them and the open car. Well, I think candidly we're drawing a somewhat fine line between, because he can refuse consent, but my position is he goes a little bit further than refusing consent. My position is that a reasonable officer, based on his training and experience, can hear not once, not twice, but three times without prompting, I don't want you guys searching this vehicle, and have reasonably the inference, you know. This is a little weird. I think this individual has particular reason not to want to send the vehicle, and that could have an innocent explanation. He could just not want to deal with. So far you're still placing your argument that non-suppression was appropriate in the context of Terry Motorist Stops. Yes, Your Honor. The brief suggested a different way to affirm. Yes, Your Honor. Are you not going to press that? I am, Your Honor. I thought based on the prior discussion I would start with the terrorist framework. But I think, like I said, the amalgam of circumstances, I think up until 947 it's undisputed. I don't think each of the things, the criminal trespass, all these various things had fallen away. I think you've got more than enough with the arrest, the criminal history, the protective behavior. I think you've got more than enough, even if the cutoff were 947 to extend the stop. As I said earlier, I think if you really home in on that video, you see that we don't need to start as early. We don't have that whole 25-minute period to defend because they're legitimately investigating the registration sticker all the way up basically until the dog alert. But turning then to the other ground that the government has urged, which is essentially that this stop is not governed by the very sort of strict Terry framework which ties the permissible scope and permissible duration of a stop directly to the stop's mission. Our position is that because there was probable cause that developed after the officers had already engaged Mr. Cortez during a valid, undisputedly at that point, valid Terry detention, it developed into a probable cause detention which gives the officers more leeway in the scope and duration of their detention than a strict application of Terry or Brigham, this court's sort of refinement of Terry, would give them. And I think I heard Your Honor sort of preview a concern about the limiting principle for the government's theory here. Is it just that any time an officer has probable cause for any minor violation, they can detain someone indefinitely? And that's not the position at all. I think the limiting principle comes from cases like the Supreme Court's decision in Wren or some of these other sort of seminal pronouncements on the Fourth Amendment which are that if you've got probable cause to detain someone, the detention won't violate the Fourth Amendment as long as it's reasonable. And that is obviously a very squishy standard. It's a general reasonableness limitation. But I think this case presents a pretty easy one to resolve. So if you have, your theory is if you have most traffic stops, both tinting and licenses, the two grounds you have here, those are arrestable offenses, right? Yes, Your Honor. Okay. So your theory is that every time in Texas someone's pulled over because of tint or without a license, the police have probable cause to arrest, but if they choose not to arrest, they can detain them outside Terry till they bring a dog? I think that's right for the license at least. The tint alone— What's your best circuit authority for that? So I don't think this court— No, any circuit authority. Yes, Your Honor. The 2002 en banc decision from the Seventh Circuit in United States versus Childs adopts the government's theory here I think almost exactly. And there Judge Easterbrook writing for the en banc court goes through exactly the analysis I think that I'm asking this court to go through, which is, look, as Judge Easterbrook put it, probable cause makes all the difference. It's too blunt to equate all traffic stops or all Terry— all traffic stops, all stops for minor sort of traffic offenses with Terry because probable cause gives officers more leeway. Now the court there said that we're not necessarily saying that any time the police have probable cause for a minor violation, since it would be constitutionally permissible to arrest them, take them down to the station, book them, which is a very significant intrusion, then they would necessarily be able to hold them there by the side of the road for an equal amount of time. The court said we're not saying that. We're saying that once probable cause exists, you're no longer under the strict bounds of Terry. The question is whether the stop as a whole remained reasonable. It sounds to me like this is Thomas's dissent in Rodriguez. It sounds like you're asking us to just ignore Rodriguez. Well, Your Honor— You're saying the reasonableness framework applies, but you're saying they can continue to prolong the detention until some ill-defined moment that it becomes unreasonable. Well, I've thought a lot about Your Honor's concern about Rodriguez, and I think it's addressing a very limited scenario, which is what the court there described as a, quote, routine traffic stop, and then went on to define as a stop based solely on an officer-observed traffic violation. This is not— If the Rodriguez ruling extended to every probable cause detention, I think it would be— That's the oxymoron. Probable cause detention? Probable cause detention? If you have probable cause to arrest, then you have to get somebody before a magistrate quickly. Probable cause to arrest doesn't allow you to arrest someone, and then do whatever you want for as long as you want, like get a dog. Our position, Your Honor— Look, I think Rodriguez is limited to two traffic stops, and I think— You're denying this is a traffic stop? Well, this was— It was started as a welfare check. It was a call for someone who was trespassing on— But you litigated this in district court as a traffic stop. I'm not— I don't know that we called it a traffic stop. I mean, I think we're— Maybe this is semantic a little bit, but I think Rodriguez used traffic stop as a term of art that was limited to an officer observing a traffic violation in progress and then pulling someone over, stopping a motorist in progress. I mean, I think that's the scenario that Rodriguez explicitly limited itself to, and it's kind of interesting because you do have this debate between the majority and the dissent there about this is mushing all traffic stops, whether based on probable cause or reasonable suspicion, together, and look, maybe in the traffic stop context, that makes a little more sense because how do you know the difference? I mean, if the officer sees someone speeding, clocks someone speeding with a radar gun, is that probable cause for a speeding violation? Is it reasonable suspicion? Cortez was detained until he was arrested, and he was arrested when they found the bullet, right? Yes, sir. Okay. How was he not arrested when you cuffed him and put him in the police car? Was he still free to leave even though he's cuffed and in the police car? No, he's detained— No, no, no, I'm asking, was he seized and arrested when you cuffed him? And if not, what's your best authority when you cuff somebody and put them in a vehicle they're not arrested? You know, I don't have a case right off the top of my head, Your Honor. It's my understanding that someone can be cuffed during a Terry detention in circumstances that don't arise to arrest. I mean, certainly, you're not free to leave during a Terry detention, right? Just because the officers have you there and have said, look, you're here, you're detained while we investigate— So he wasn't arrested, he was just detained until they find the bullet? Correct. Okay. Fine. And you're saying, alternatively, there was enough reasonable suspicion all the way to the dog sniff, or in the alternative, this theory that the arrestable offenses that he wasn't arrested on justify— actually mean that we're outside of looking at prolonged detentions at all? Yes, Your Honor, correct. And I think this court can affirm on either of those grounds. Before I conclude, I think under the Terry framework, I think this court's decision from 2020 in Reyes is kind of the government's North Star. I think it is quite close to this case. It involved a motorist who displayed some protective behaviors. It really illustrates the proper approach of not using a divide-and-conquer approach for each of the suspicious circumstances. I'd also highlight this court's decision in Pack where it explained that under the Terry framework, the officers don't need to have suspicion of a particular crime, they just have to have suspicion of criminal activity afoot. And in that circumstance, they have to limit their investigation to avenues of investigation or to investigating crimes that, if established, would explain the suspicious circumstances. And I think here, certainly doing an open-air sniff had the potential reasonably to explain the suspicious circumstances that the officers had observed. And if the court has no further questions, we would ask that the judgment be affirmed. Thank you, sir. All right, back to you, Mr. Sherwood. Thank you, Your Honor. Before I directly respond in rebuttal to the government's arguments, I wanted to point out a response I did not give to Judge Higginson when he pointed out that a decision was made to appeal the suppression. That was a tactical decision made by trial counsel. It doesn't matter why. All right. I just wanted to point out there was an agreed sentence. There was an agreed sentence. That's why they did it. There was an agreed sentence. Now you are making me curious. Did the guy get consecutive on the revocation plus the felon? Yes, but it was a 30-month sentence on the one plus 18 on the other to equal 48. They agreed. The government and the defendant agreed to that for whatever reason. Perhaps they thought Judge Counts would give more. I don't know. Okay, fine. Yes, I understand. All right. There was a non-criminal reason for Mr. Cortez not to open his windows more and not to open the door. That truck was a mess. I mean, it was like the little kids playing with their toys and they didn't put their toys back in the toy box. When I looked at the video, I thought, how did they find anything? I don't know how he drove. It was just a mess. So there is a non-criminal reason for Cortez to refuse to consent to the search. He could have been just embarrassed at how messy his truck was. The sticker, the government says that Corporal Tarango said at about 10.10 that Cortez was still being held. Tarango did not testify at the suppression hearing. If that's on the video, then that's on the video. But I thought someone testified at the suppression hearing that the sticker investigation was over and nothing's really happened on that. Mr. Cortez was polite to the officers when he left the vehicle. He wasn't yelling at them. He wasn't jumping up and down and screaming. Now, he does say, y'all don't do your job right, which I don't like that phrasing. But what he's meaning, Cortez has seen this movie before. He wakes up, he sees three or four officers around. And it's like, oh no, here we go again. And I understand both sides of the argument on that. But just to say that Cortez was rude to the officers, that he was hiding something, I don't agree with that. I respectfully disagree with the government on that. Let's see if I had anything else to say. Did you read the Seventh Circuit child's decision? Do you have any thoughts on that? I don't have any thoughts on that. I mean, I've read it a long time ago. But I mean, if you want, I can provide a letter brief. I don't know if that's it. Okay, that's fine. It's a 2002 Seventh Circuit en banc case. I don't know if any other circuits have followed that precedent. I mean, this circuit could. But again, I think if this circuit does that, then we're going to go, as I argued earlier, if you've got any problem with your driving, any problem with your license, et cetera, et cetera, you're going to be subject to being stopped and detained until the officers find something. This was a frustrating case for the officers. They're called out on a check welfare, and they keep finding things, but nothing adds up. And then they think they found drugs because the dog alerts. The dog can tell us there were drugs there, but not when the drugs were there. And then all they find are two bullets and a towel on the floorboard. Well, for the reasons I've argued earlier, the case should be affirmed. I need to correct my August 5th. I'm sorry, I'm sorry, it should be reversed. Thank you for shaking your head, Judge Higginson. It should be reversed. I need to correct my August 5th letter because the government pointed out that Mr. Cortez, as soon as he was released from federal custody on the prior offense in May of 2017, or whenever in 2017, he went into state custody. So yes, he's still on supervised release, so he could be revoked. The conviction on the 2020 offense should be vacated. Mr. Cortez should be then returned to finish his supervised release on the earlier conviction, and that is the relief I am requesting. Are there any other questions? Let me ask you. I mean, I understand your consternation about the whole scenario. I got that. On the first go-round, you cited McKinney. I got that. In my response back to you, I said, well, I don't think that you're arguing that, like McKinney, where the court says all else is hay, was a hunch. So I don't think you're arguing this is a hunch case at all. I'm arguing it's pretty close to a hunch case. Okay, all right, okay. He's a former drug user. So, oh, well. I just want to make sure from that aspect of what you're arguing. Okay, so I see you are arguing it's pretty close to a hunch. Okay, let me just finish. So I was going to ask you, given this hour, et cetera, all that's been said, as our cases say, the ultimate test of orthonymity is reasonableness or not. So you're wanting the panel to hold it under the totality of circumstances that is all unreasonable or exactly what? I heard what you said earlier a wide time, but I'm just still stuck on where within the precedent, you know, this fits, given the scenario. Like I said, I understand the consternation. I get all of that. But it's one thing we offer them. We may look at something that looks weird, it looks bizarre, et cetera, but unless we break a new ground, that's all I was asking. But if you've said all of the consanguinous in the brief and not precedent, just trying to understand where's the legal north star, you know, the word is what you ask. We can't just say it. I understand. And unfortunately, I'm not as expert in the nuts and bolts of this as I should be. I mean, I can say right now that it should be under the totality of the circumstances test, but that would just be a guess on my part. Sometimes I get lost in the weeds and I just see the big picture, and that's what I've done here. And I apologize for not getting it closer or getting it more on a micro level. No, no apology needed. We appreciate, you know, the experience you bring to this.  And that will lead me to say that you are CJA counsel appointed to handle the case and we understand the particular situation that you may not have handled from the beginning and so on and so forth, but nonetheless, you and other counsel ably take the cases and represent the clients forthrightly and especially when we set the case for an argument to come and answer questions candidly and so forth. So it's just to say in this case and all cases, the panel and the court does appreciate you as CJA counsel willing to take the case and present it to us. And with that, we thank you. Thank you, Your Honor. All right, thank you. And the government, we appreciate the argument. The case will be submitted.